Whenever you're ready, we'll be happy to hear from you. Good morning, your honor. May it please the court, my name is Charles Curlett. I represent Eric Gordon. Eric Gordon did not receive a fair trial. That's the reason we're here today. There were five grounds for appeal. First, the district court erred by admitting into evidence voluminous records from Eric Gordon's bankruptcy proceedings that contained inadmissible hearsay. The government then used those prejudicial allegations that were contained in the various complaints by the assistant United States trustee and his testimony at trial to tarnish Mr. Gordon unfairly. Second, in closing arguments, the government repeatedly told the jury that Soleil Stevens, the primary, the criminal actor in this case who had pled guilty and testified against Eric Gordon, that the money that would be deposited into Eric Gordon's bank account was tainted. And that was not true. Soleil Stevens never said that. And the government then used that term to argue that Eric Gordon knew that the money that was coming into his account were the proceeds of unlawful activity, which is what is required to sustain a money laundering conviction. Third, the government failed to establish that Eric Gordon had actual knowledge of the illegal nature of the financial transaction. And under Rule 29, that would have resulted in a vacating the conviction. And moreover, the district court abused its discretion in denying the motion for a new trial under Rule 33 due to the prejudice that Eric Gordon suffered by the cumulative weight of the errors at trial. Fourth, the district court erred in giving the willful blindness instruction. That instruction, coupled with the prejudice from the bankruptcy proceedings and the government's characterization and use of the word tainted in closing arguments, led to a devastating result. And the fifth argument is that the district court should have dismissed the indictment and allowed the defense to challenge the decision to subpoena Eric Gordon's bankruptcy lawyer to testify in the grand jury. Now, the first argument that I've raised relating to the prejudicial bankruptcy records, what we're really focused on is what the trustees' evidence in the form of the testimony and the multitude of complaints from the bankruptcy proceedings and the effect that they had. And there are many, many, many examples in this very voluminous record. But I'm going to focus on two sentences that I think illustrate clearly what I'm talking about. The first is, at trial, the assistant United States trustee testified. So after Hanover informed us that they had begun a huge audit of the books and records and Mr. Stevens' transaction and found many dollars missing, millions of dollars missing, we turned around and made an immediate referral to the United States attorney on this matter. So here we see that the assistant United States trustee, aware of the massive fraud that Soleil Stevens had undertaken against his employer, Hanover Insurance, that he had kept a secret from the many people he had used to launder the funds over the years from that crime, as soon as the trustee sees that that money went to Eric Gordon, the trustee assumes Eric Gordon's knowing involvement and guilt. And that was a leap that he didn't have the evidence to make and that the government needed to persuade the jury to make through the presentation of evidence. So what evidence do you see that he had to make that referral? Any? Well, to make the referral, I think it's sufficient to say we see that Soleil Stevens stole this money and that money went into that account and that raises a question and we need an answer and so I'm going to refer it to you, United States attorney, to look into that. Doesn't he also have some information at that point that perhaps, not necessarily certainly, but perhaps Mr. Gordon has not been forthcoming with the trustee about his receipt, deposit and disbursement of those funds? Well, I'm not disputing that the trustee didn't have reasonable grounds to make a referral. The problem is the conclusions that the trustee reached and as he articulated it in the complaints that were filed in the bankruptcy proceedings, reached the conclusions of Eric Gordon's culpability of the criminal charges he subsequently faced in the indictment and it's set forth in one of the, in many of the complaints. Every time the judge, every time this came up, didn't the judge give the right instruction to the jury saying, look, don't, you can't draw anything from this. These are just allegations. That's all they are. Don't take them for the truth of the matter. The judge occasionally gave an instruction. Frequently. I mean, I did look at your voluminous record. Right. Well, but not the instruction that we had asked the judge to give. I mean, the fact of the matter is whenever it would come up, Judge Motz would lean forward from the bench and make a set statement, ladies and gentlemen of the jury, this is hearsay. I rely upon you to ascertain that. Ladies and gentlemen, these are just allegations. The choice is yours. Right. It's up to you to decide. Right. And, okay, but. This is pretty responsive. It is, but I don't think that it's sufficient to overcome the overwhelming prejudice that was suffered by Mr. Gordon by admitting the incredible volume of complaints in the bankruptcy proceeding, coupled with the United States trustee testifying to the jury. I knew that Eric Gordon had committed a crime here. The danger is that it allows the jury to substitute the judgment of the United States trustee for their own. It's the reason I cited the cases. I mean, we do have cases talking about the admission of judicial rulings because we're worried that juries will think, well, if a judge did that, I'd probably agree. But is it your sense that juries hold bankruptcy trustees in that kind of, that they're really going to be moved by the allegations of a bankruptcy trustee in the same way? Well, I do. I mean, this is a senior government official who is coming in with the imprimatur and authority of his office and talked at great length about his authority, his responsibility, the duties of his office, and then testifies to the jury, both in the sentence I cited a moment ago, and, again, this sentence from one of the complaints. Making this conclusory statement, additionally in exchange for a significant fee, the Gordons used this entity to help an associate launder hundreds of thousands of dollars he embezzled from his employer. You'll notice also the trustee is lumping in Eric Gordon's wife, Laurie Gordon. She, of course, was never charged. The Gordons then concealed the transfers and their receipt of this fee from the United States trustee and the Chapter 7 trustee of both their personal and business cases, even going so far as to create fake documents and to concoct elaborate phony transactions to cover their tracks. Those were issues that the jury needed to decide in this case through evidence that would support that, not through the conclusory allegations made by the United States trustee. The complaint you just read, the one where the answers were also read off corresponding to the different allegations during the trial. So I think no. Well, let me adjust that answer. I don't know. There were two categories of information that were coming into evidence from the bankruptcy proceedings. The 404B motion that the government filed said, we want to introduce Eric Gordon's statements that he made in the context of the bankruptcy proceedings, answers to interrogatories, answers to complaints where there were particular paragraphs. But the problem was there were many, many, many paragraphs and other documents where no response was required from Eric Gordon, where the United States trustee was making statements like the one I just read, which is a statement that required no response from Eric Gordon. Those are the prejudicial statements. When we received the 404B motion pretrial, there was a long list in there setting forth, here are examples of questions that were asked and these are the statements that Eric Gordon made and this is what we want admitted into evidence. And as the record reflected, we cited in our brief, Mr. Levine said, well, when you cite the statements made by the defendant, presumably that's going to help the defendant, but what's the danger of these bankruptcy documents coming in? Well, now we know because once we get to trial, we start to see the attempt to admit these complaints into evidence and have the trustee testify about his own conclusions. I think it's perfectly on point with the Zimmerman and Brown cases where the statements of the bankruptcy judges were impermissibly admitted into evidence. Very similarly, the bankruptcy judge's referral to the United States Attorney simply saying, I'm sending this over to you was deemed prejudicial. We have the same thing here. But again, all of those cases talk about the special potential for prejudice when you're talking about judicial rulings. Well, the standard, though, you can have prejudice any number of ways. And the analogy of the authority of the United States trustee and the authority of the bankruptcy judges, even if we say a bankruptcy judge is inherently more prejudicial by some matter of degree because they're a judge, it doesn't mean a statement by a trustee cannot also be prejudicial. Right, but it is a way of distinguishing those cases, which do rely, in memory, I could be wrong, on a sense that there is special potential for prejudice when we're talking about judicial rulings. I think that there may well be. But it doesn't mean that these statements were not prejudicial. Clearly they were. In addition, the statements of the United States trustee went drastically further than the statements of the bankruptcy judges in the Zimmerman case. In the Zimmerman case, the bankruptcy judges were somewhat equivocal. While this could suggest that there was criminal activity, it could also suggest that the lawyers were asleep at the switch and they weren't monitoring their escrow accounts the way they're supposed to. But here we have the United States trustee saying, look, this guy Salih Stevens is a massive criminal, and Eric Gordon knew everything that was going on with him. And, in fact, he didn't. Even Salih Stevens, when he testified, said, I had two meetings with Eric Gordon, and I said to him, look, I know you need some money. I can get you some money. I'm going to get it to you. But he never tells him where it comes from. He never tells him that this money was money that he had stolen. And, in fact, it came out often at trial that Salih Stevens had used many people, including his daughter, including Eric Gordon on prior occasions, including John Cohen of the NASCAR team, including C.V. Lockhart in Los Angeles. These are people to whom he sent money so he, Salih Stevens, could launder the proceeds of his illegal activity, unbeknownst to those people. Suddenly, Salih Stevens gets caught. He needs to turn into a cooperator, and he turns around and says to the government, well, that very last time, that one time, I tipped my hand a little. And I said to Eric Gordon, look, I can get you this money, but, you know, it's got to be kept off the government's radar. And, you know, it might not pass the smell test. So what did Eric Gordon do? He heard these statements, and he said, well, what do you mean? Why would someone need to keep something off the government's radar? And Salih Stevens' answer was, well, for tax purposes or so that it can't be tracked. Now, here's the key thing to remember in that critical moment. Eric Gordon was talking to his lawyer. He was talking to his lawyer. One has the right to expect, if there is a question about the propriety of a particular transaction in which one is going to engage, that you can rely on the advice from your lawyer. A lawyer who, Eric Gordon didn't know he was a criminal. Eric Gordon didn't know that he was stealing. This case wasn't decided based solely on the testimony as to statements made. As I see it. Maybe I'm wrong. There was. But there are facts and circumstances that also were weighed or presented in the case, such as, take out Salih Stevens. Let's say Salih Stevens said the money's legit, nothing to worry about. That's a little bit of an unusual transaction to plop $550,000 in somebody's account under the guise of you need to appear capitalized and then turn around and write the checks out within a very short period of time to a third party entity. There are things like a backdated bridge loan agreement that's not signed by the individual who allegedly or supposedly provided the money. So I understand your focus on the statements that were made. But there are a lot of facts in this case, too. Right? Well, I could, as we have done, argue the facts of this case for another hour, but I only have two minutes. So let me focus. Let me make the concession for the purpose of this argument that there is circumstantial evidence that may have been sufficient to sustain a conviction. Just like in Zimmerman, where the Tenth Circuit expressly held there is sufficient circumstantial evidence to sustain a conviction. The problem is, and this is what this Court analyzed in the Incy case, you have to look at whether it was a close call. And when it's a close call, you then have to consider the prejudice. How long was the trial in this case? I think roughly two weeks, maybe several days. Two weeks. Well, it's hard to believe that this one error of which you complain, if it is indeed an error. I don't know that it's indeed an error, because there are reasons for the district court's discretionary call. But the government points out that there were numerous texts, numerous e-mail messages, testimony of seven different lawyers, and more than 220 other exhibits. In other words, there was a mountain of evidence. There was overwhelming evidence that was brought in on this case. You must have been drowning in adverse evidence. And so it's hard to, you know, believe that this is not a constitutional error. This is a question of whether there was substantial rights. It's not under a Chapman beyond a reasonable doubt standard. It's just under whether substantial rights were affected. And given the mountain of evidence that came in, the length of the trial, it's just hard for me to believe that this result was driven by this one error, if it even is that, that you complain about. Your Honor, my time has expired. I can address the remaining points. Just think about that for about a minute. I will do that. Thank you, Your Honor. May it please the Court. Judson Myhock for the United States. I'd like to pick up where Judge Wilkinson left off, that there was a mountain of evidence in this case and overwhelming evidence. And I'd like to begin by focusing on count three. Actually, just before we move off what we were talking about, why not redact the parts of the bankruptcy complaint that, you know, weren't needed to give context to an answer? It does seem like there were those introductory portions that lay out the charges against Mr. Gordon tracking the counts of the indictment. Pretty high potential for prejudice and literally no probative value. So why couldn't you just redact those? There's a number of reasons why. Well, first of all, the defendant's answers to those exact complaints, the introductory paragraphs. He refutes paragraph by paragraph what was in the introductory paragraphs in those complaints. So it lays out, and we introduced both. That was our intention all along because we thought it was fair for the defendant's responses to those even before he got to the numbered paragraphs. And I think Judge Osteen's point on that is well taken. Then when you get to the numbered paragraphs and the answer is admitted, denied, denied in part, admitted in part, you have to have the complaint itself in order to provide context. I want to hear your answer to Judge Harris' question, but you brought it up. You've got a double hearsay question with the answer. They're being presented as the defendant's response, but they're really not. They're the lawyer's response to the pleadings. So they're not verified answers. So in response to Judge Harris, or the concern, at least for me, is particularly when you're dealing with what might be considered very inflammatory allegations, all there's the jury's seeing is what the lawyers wrote, and it's being attributed to the defendant. In this case, the bankruptcy attorney, Mr. Schrapp, who represented the defendant in the bankruptcy proceedings, testified. And with his testimony – But weren't the answers prepared in the adversary proceedings by other counsel? There was a later bankruptcy attorney who prepared some of those responses as well, but the source for that information, for all of those responses, was the defendant. In fact, the cases we cited in our brief from the Seventh Circuit about bankruptcy proceedings and sort of the more restrictive attorney-client privilege that applies in that context applies because there is not the same level or expectation that information that the defendant, or the petitioner in a bankruptcy, is providing to their bankruptcy attorney, answers to questions and interrogatories, answers to the complaint, are going to be provided to the chapter seven. Why wouldn't you use Schrapp's testimony as to what the defendant had told him and redact out the prejudicial parts of the pleadings? The difficulty when we were in trial after providing 404B notice some months prior to trial, after providing our exhibits a week prior to trial, that we were on three days after the jury trial had commenced when the defense was interposing these objections. We invited the defense. I don't know what their exact defense is. For all I know, they want the defendant's answers in the complaint to that. You know what's hearsay and what's not hearsay. But to say, here are 200 exhibits from the bankruptcy petition among hundreds of exhibits that were introduced, and for the defense to say, well, there's some hearsay in there, redact it. We were begging the defense, tell us what paragraph, tell us what you want redacted. And, in fact, they had interposed an earlier objection to e-mail communications and text messages, and I had attached a letter. When they had raised those objections, we said, great, tell us what, let's try to work this out. And they made specific objections, and we went through and we worked out, and there were probably 50 or 60 exhibits. We redacted some, some we agreed not to introduce. We went through that exercise. When we got to the- Was your answer then that we were just going to put it all in unless and until such time as the defense objected? We didn't anticipate at all that there may be some prejudicial hearsay allegations contained in these pleadings, and, therefore, we didn't have time to redact? Your Honor, with regard to these answers and the witnesses we know we're going to put on, the source for these answers and the source for this information was the defendant. And so this is no different than the res gesti, if you would, in like a wiretap situation where you have those reciprocal and integrated exchanges, the defendant's response to those. I think just a generalized objection to none of this should come in, and then the defense actually was three alternatives. First was all of this should be excluded, we're three days into trial. Second, inviting the court, the district court, to redact the information. And the third alternative was to provide a curative instruction, and picking up on Judge Harris's point, that is what they asked for. That is what the judge granted at the end of the trial. The judge, in the substantive instructions to the jury, gave that instruction verbatim, and four times during the course of the trial, sometimes completely unprompted, Judge Motz told the jury, instructed the jury, these complaints are being introduced, disregard them, they're not being offered for the truth, they contain hearsay, they're just being provided to provide context for the defendant's answers. The other portion. So Judge Motz gave instructions throughout. Very experienced, learned trial judge. At one point he's trying to weed through these documents that are coming in. What he tells the jury is, this is hearsay, just disregard it. What does that mean in your mind? And he amplified, you have to take the instructions. I'm just talking about right at that moment during the trial, when he gave that instruction. What does that mean? Disregard the exhibit? To, again, that it wasn't being offered for the truth. I'm asking you, you remember that limiting instruction he gave? This is hearsay, just disregard it. I do, Your Honor. And there were sometimes where he was. What does that mean? That it's not being admitted as evidence that you're relying on. It's, again, for the defendant's exchange. I think you need to read those, the curative instructions that the judge gave, cumulatively, and also the instruction that the judge gave at the end. I read all those. My point being that would you agree or disagree that some of the information in there was pretty inflammatory in terms of allegations? Not prejudicial, just inflammatory. Not in the context. The other thing that we need to bear in mind here is that this was the trustees, the Chapter 7 trustee and assisting United States Trustee Neal, they weren't fishing around in the dark. The defendant knew early on they were focused on transactions and bank records because they had a good faith belief that the defendant was hiding money. We can see that in the record through the text exchange that Mr. Stevens and Mr. Gordon have in January of 2013 when Mr. Stevens is looking for the balance of the money that had been laundered through Mr. Gordon's account  and Gordon's response is this is not for texting, then they get on the phone. This is January of 2013. I got that. I'm just kind of focusing on the complaint and the answers right now. I don't think there was nothing more sensational than the facts and allegations in the indictment and viewed in light of what was happening and transpiring in the bankruptcy. Remember, this whole fraud scheme became unraveled because of the trustees' focus on these records and looking for these bank records and that there was money that was being hidden from the bankruptcy petition. When you're looking at that and focused on that and they're asking specific questions, we need all the bank records, and between the audit in August of 2012 and mid-October of 2013, some 14 months, there's 13 specific requests for bank records. They're asking for specific information related to a business, RHSI. The defendant had made statements that were all over the map, wildly inconsistent, both in these answers when he's discussing RHSI, in the bankruptcy audit at the 341 hearing in October of 2012, and even to his bankruptcy attorney that RHSI ceased operations in August of 2012, that he had shut down these bank accounts when he left the state of Maryland and moved to Martha's Vineyard. Then later he said that the bank shut down those accounts. So they were very focused on these accounts and these transactions. I think in light of all the evidence in the case and what we saw at that point, again, it wasn't just the trustees weren't stumbling around in the dark. They were focused and looking for these bank records and the repeated requests and the defendant's efforts to subvert and distract and not comply with those requests for these records. I think that was the key with regard to that. With regard to the cases out of the Tenth Circuit, Zimmerman and Brown, and Judge Harris is right on point, that in those cases, the danger that the court was focused on was the fact that these were findings and statements made by bankruptcy judges who did not testify at trial. So there were two problems there. First of all, these witnesses didn't testify, and second of all, they were judges who were issuing orders and making rulings, and that is exactly the decision from the Tenth Circuit in Zimmerman and Brown. The Tenth Circuit is saying this could create massive confusion for a jury, thinking that these are the rulings of a court and therefore binding on us and we have to abide by these previously made rulings. Well, the court's curative instructions tried to dispel that impression. Absolutely. I think that was in part what they were aimed at. Absolutely, Your Honor. And Assistant United States Trustee Neal testified in this case, and the actions he was taking at various times were tracking the requests and the things that were happening in the bankruptcy petitions, in adjudicating those bankruptcy petitions. The requests for those records, over and over again, both the trustees and Assistant United States Trustee Neal requesting those records, the defendant's response to those requests where he's repeatedly not providing them, he's blaming P&C. At the end of the day, the account through which he laundered $545,875, which ultimately went to this NASCAR racing team, the bulk of it, there were less than 30 pages of bank records. It covered less than six months of actual activity. The bank account was opened in June of 2012, and for all intents and purposes, the money had been put into the account. Sometimes these evidentiary rulings that are challenged on appeal, we tend to get so focused on them that we lose sight of the perspective of the entire trial. And you say this one went on for several weeks. Yes, Your Honor. It spilled into a third week, a third week trial. It's fair to believe that the jury was focused on the evidence in its totality and not just one piece of it. Absolutely, Your Honor. In addition to the filings and the bankruptcy, and there were the two petitions and all the adversary proceedings, there were numerous text messages and e-mail exchanges. The defense tries to argue that the defendant put an innocent spin on those. But at the end of the day, the way that Mr. Stevens testified, and when you consider what was in those text messages and those e-mail exchanges, you can see them crafting and creating this backdated bridge loan agreement after the fact that a NASCAR racing team is loaning $550,000 to a defunct physical therapy business. It's patently absurd, and that's why there was confusion about this. And you can see we have those exchanges. They were admitted, both e-mail and text messages, as Mr. Stevens is trying to craft this after the fact document. This is a year later and over a year later, and he's saying, what kind of date should I put on this? That date's too tight for gap financing. They're fabricating to cover the money trail here well after the fact. So there was a mountain of evidence, and it wasn't just Mr. Stevens' testimony. It wasn't just Mr. Stevens said and then the defendant said something different. Here we had the defendant shifting stories through the bankruptcy proceeding, how he characterized and cast RHSI, his efforts to subvert their attempts to obtain these bank records, the delay, the blaming P&C, the partial production. The first time he produces RHSI P&C bank account records, remember there's two bank accounts. When he's at the 341 meeting in October of 2012, he says, well, there's one account at P&C, but bank account doesn't mean that. We don't need to rehearse the entire trial. Yes, yes. We don't need to go through it piece by piece. I'm going to ask Judge Harris if she has any further questions from you. Judge Osteen, do you have any further questions? Thank you, sir. Okay, thank you. Mr. Carlett. Thank you, Your Honor. This case, this appeal, is about the prejudice that Mr. Gordon suffered. I have already reviewed today the voluminous prejudicial evidence that came in in the form of the bankruptcy proceedings. Your Honor has asked about the mountain of evidence, and wasn't it overwhelming? And if you look behind me, we have the seven-volume joint appendix on counsel table, and it's not perfect, but the two volumes to your left contain most of those bankruptcy documents that are prejudicial. So the literal mountain of evidence, which is on that table, fully 30% of it is prejudicial evidence that never should have been admitted in that way, in that form, at least without the cautionary instructions that we had requested. The other critical prejudicial thing that happened at trial was the government began to testify in its summation imputing a key word on the part of Soleil Stevens that he never said, and that is that the funds were tainted. Why is that so critical? Because the word tainted, if Soleil Stevens had said that to Eric Gordon, that puts him on notice that the money is already dirty. It's perhaps stolen, and it's going to come into your account. That's the essence of money laundering, as the court instructed the jury in this case. It was repeated seven times, and the government has argued in its brief that, well, seven mere mentions of a word couldn't possibly have swayed the jury when there was a mountain of evidence, a third of which we now know is prejudicial. But that commentary was devastating. It's been highlighted in my brief, but I direct the court to it again. There had been discussion about access to funds, the tainted funds, the stuff that wouldn't pass the smell test. I've got to move my stolen money, the money that's tainted, that won't pass the smell test. Again, on rebuttal, the government. When he tells Mr. Gordon at Ruth's Chris in Stony River that the funds are tainted, that never happened. Soleil Stevens did not say that he said that, and it goes on and on. When Soleil Stevens says the funds are tainted, he just knows there's some unlawful activity. Tainted funds. He says it, and then he says it again and again and again and again and again and again, seven times throughout the summation. And when you have an assistant United States trustee who has testified for days in a trial. The funds were tainted, right? But Eric Gordon didn't know that. Understand. The problem is that. Your complaint is with respect to the use of the word, tainted. They were tainted. And so to find that that was prejudicial, splitting a pretty fine hair in terms of that, because had he said, say, for example, the ill-gotten gains or the illegal funds or the wrongfully obtained or the criminally embezzled funds, whatever. That would have been okay, right? That's what makes someone guilty of money laundering. So isn't tainted funds a very similar description? Well, no, because Soleil Stevens didn't say anything to Eric Gordon. That's a separate question in terms of whether or not he's recanting to the jury actually what was said. Your complaint is his repeated reference using the word tainted. And imputing it to Soleil Stevens. It's all about Eric Gordon's mens rea. What did he know about this money? Eric Gordon sat down with his lawyer and said, I am once again in a financial pickle and I need some money. And his lawyer said, I can get you some money. I can put together a deal. What do I need to know about it? Well, we've got to keep it off the government's radar. Why would someone need to do that? Well, tax purposes. So far, so good. And the only thing he says is, you know, this might not pass the smell test. Well, what does that mean? Does that mean that we're committing a crime? I'm your lawyer. I've always been your lawyer. And all of a sudden, you should now suddenly from that offhanded remark take it to mean that you don't know I've been stealing millions of dollars, but I'm going to put it through your bank account and you're going to be laundering all this money? It's the first Eric Gordon ever heard of any of this. And all he gets is this one statement by his attorney. I go through these different counts of money laundering and the falsification of the bankruptcy and the mail and wire fraud counts. Yes, sir. As far as I can see, the jury was instructed correctly on these things. And, you know, that also seemed to me in reading the briefs in this case, that there was just ample evidence for the conclusion that the jury came up with and that this guy was involved in financial shenanigans of every kind of sort. You know, you've got to give some credit to the jury's common sense when you can, you know, complain about this and this and this. But, you know, when you read what this trial was about and what this defendant was up to and what the instructions put to the jury were, didn't they assess it just about right? I see my time's expired. Can I respond to the court's comment? Yes, you may. If Eric Gordon had been convicted after a fair trial, there would be little to complain about. But it wasn't fair. And that's the issue and the principle at stake today. Thank you, Your Honor. We will adjourn court and come down to recess. It's now before us to adjourn. I'm glad that we've been able to say some final words.
judges: J. Harvie Wilkinson III, Pamela A. Harris, William L. Osteen Jr.